UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ROBERT TELMANOSKI and
DONNA BRANDZ,

    *Plaintiffs*,

v.

BONEFIH GRILL, LLC, t/a BONEFISH
GRILL, DS SANCHEZ CLEANING
SERVICES and JOHN DOES 1-10,

    and

BONEFISH GRILL, LLC, t/a BONEFISH
GRILL,

    *Third-Party Plaintiff*,

v.

DS SANCHEZ CLEANONG SERVICES,

    *Third-Party Defendant*.

Hon. Joseph H. Rodriguez

Civil No. 20-5466

**OPINION**

This matter is before the Court on the motion filed by defendant Bonefish Grill, LLC seeking to preclude the testimony of plaintiffs' economic and vocational expert, or in the alternative, for an evidentiary hearing pursuant to Federal Rule of Evidence 104 [Dkt. No. 51]. The Court is in receipt of the opposition filed by plaintiffs Robert Telmanoski and Donna Brandz [Dkt. No. 52] as well as Bonefish Grill LLC's reply [Dkt. No. 54]. The Court has considered the submissions of the parties as well as the arguments advanced at the hearing convened on November 17, 2022. For the reasons set forth herein, the motion will be denied.

1

I.   **Background**

Plaintiff Robert Telmanoski ("Telmanoski" or "Plaintiff") worked for a food delivery service that delivers foods to defendant Bonefish Grill restaurants ("Bonefish"). On April 12, 2018 approximately 8:30 a.m., Telmanoski was delivering food to the Bonefish Grill location at 3121-F Fire Road in Egg Harbor Township, New Jersey. No employees were in the restaurant at that time and Telmanoski used a drop-box key to enter. Telmanoski alleges that while inside the restaurant he slipped on a piece of paper on the ground and suffered resulting injuries.

Telmanoski's complaint demands judgment for damages under the theory that he "has been and will in the future be caused to lose large sums of money dues [sic] to his inability to pursue his usual occupation." [Dkt. No. 13]. To this end, Telmanoski has identified Dr. Joseph T. Crouse as an economic and vocational expert in this matter to assess future lost earning capacity. Telmanoski served Bonefish with Dr. Crouse's Curriculum Vitae and Expert Reports dated March 24, 2020 as well as a supplemental report dated April 4, 2022, and Dr. Crouse's deposition followed. Bonefish now challenges the admissibility of Dr. Crouse's opinions under Federal Rule of Evidence 702 and has moved accordingly to preclude his proposed expert testimony in its entirety.

II.   **Legal Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony, permitting a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion, provided that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

2

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Consistent with Rule 702, the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) established a "trilogy of restrictions" on the admissibility of expert testimony. *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir.2003). These restrictions are referred to as: qualification, reliability and fit. *Id.* (citing *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)). The Third Circuit explained the three requirements as follows:

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such. Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Id.* (internal quotations and citations omitted).

A Rule 702 determination is a question of law for the district court. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 593 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003).

### III. Discussion

Bonefish contests the admissibility of Dr. Crouse's proposed expert opinion solely on the "fitness" prong of *Daubert*. *See* Reply at *3 ("Bonefish Grill's motion does not challenge the 'qualifications' or 'reliability of the methodology' allegedly used by Dr. Crouse. It is the third hurdle under Rule 702 - the 'fit' - that Telmanoski's vocational

3

expert cannot overcome."). Bonefish contends that Dr. Crouse's proposed expert testimony regarding Telmanoski's earnings capacity is a poor "fit" for two principal reasons. According to Bonefish, the proposed testimony cannot be assistive to a jury because (1) Dr. Crouse's finding that Telmanoski suffered a "non-severe disability" lacks foundation and (2) Dr. Crouse utilized an outdated Census definition of disability.

Under *Daubert*, an expert's testimony must "fit" the case. *Daubert*, 509 U.S. at 592. Otherwise known as the "helpfulness" standard, this requires that an expert's conclusion have a valid connection to the pertinent inquiry as a precondition to admissibility. *Id.* at 591-92. The "fit" requirement "goes primarily to relevance." *Id.* "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404 (3d Cir. 2003) (citations omitted). The standard for fit is "not that high" but "is higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Federal Rule of Evidence 702(b) requires that an expert's opinion be based on "sufficient facts or data." Fed. R. Evid. 702(b). An expert's testimony must "have some connection to existing facts," and "expert testimony that ignores existing data and is based on speculation is inadmissible." *Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 926 n.45 (D.N.J. 2019) (quoting *Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) (internal quotations omitted); *see also Daubert*, 509 U.S. at 590 (A court may find an expert opinion unreliable under Rule 702 should it lack "good grounds[.]"). Expert testimony may be inadmissible if "there is simply too great a gap between the data and the opinion proffered." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). As such, a court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known

to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (citing *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)). The evidentiary requirement of reliability at this step is lower than the merits standard of correctness.[1] *Paoli*, 35 F.3d 717, 744-45 (3d Cir. 1994).

### a. Opinion as to "Non-Severe Disability"

Dr. Crouse's finding that Telmanoski has vocational limitations and a work-life expectancy similar to a worker with a "non-severe disability" is predicated on adequate grounds and therefore satisfies the minimum requirements for admissibility under *Daubert*. Bonefish correctly observes that Dr. Crouse is not a physician and he is not qualified to diagnose Telmanoski's injuries or provide opinions purporting to be evidence of Telmanoski's functional limitations. But what Bonefish describes as Dr. Crouse rendering unsupported medical "opinion" is nothing more than Dr. Crouse doing precisely what a vocational economist, who is not a doctor, would do to make calculations about an individual's potential for future earnings. That is, Dr. Crouse made certain factual assumptions based on his review of the facts in this case to establish a foundation for his ultimate opinions, which are based on economic principles. Apropos of the specific challenge at issue regarding Dr. Crouse's application of the correct "vocational scrutiny," Crouse did not simply extrapolate from a speculative baseline by assuming plaintiff's limitations. Rather, he evaluated facts from a variety of sources then matched those findings to the corresponding American Community Survey ("ACS") classification to show the probable outcomes for a statistical cohort of similar persons.

---

[1] Plaintiffs do not have "to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

In particular, Dr. Crouse's reports and certification reflect that he relied upon the medical narrative reports of Gary N. Goldstein, M.D. as well as medical records from John B. O'Donnell, M.D., Jonathan Gitter, M.D., Concentra Medical Centers, Progressive Radiology, Delaware Orthopaedic Specialists, and Christiana Care Health Services in forming his vocational and economic opinions. Dr. Crouse also completed a vocational interview to identify Telmanoski's self-reported functional limitations.

Bonefish focuses on superficial differences in language over the substance of the evidence relied upon in challenging the basis of Dr. Crouse's finding that Telmanoski's conditions were consistent with the "non-severe disability" ACS category used for purposes of assessing the impact of Telmanoski's limitations. The ACS Disability Questions do not address specific injuries; rather, they focus on common limitations that may result from a myriad of injuries. D.S. Gibson, *Loss of Earning from Disability* [Dkt. 51-3]. While it is true that Dr. Goldstein characterizes Telmanoski's impairments using medical nomenclature that does not precisely match the terminology adopted in the ACS, this does not render Dr. Crouse's opinions inadmissible. The important consideration is whether Dr. Crouse's finding in this respect is sufficiently connected to the facts of the case. To support a future earning loss calculation, a plaintiff must present an evidentiary basis with "proper foundation and sufficient factual predicates . . ." *Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640, 642 (3d Cir. 1987). Telmanoski's medical records show permanent medical diagnoses of internal derangement of the right shoulder including a full-thickness rotator cuff tear of the supraspinatus portion of the rotator cuff, transverse tear of the humeral ligament with dislocation of the biceps tendon with damage of the tendon as well as surgical intervention in the form of a left shoulder arthroscopy with arthroscopic biceps repair

on May 18, 2018. [Dkt No. 51-3 Exhibits B, C]. Referencing these objective medical findings, Dr. Goldstein opines in his narrative report:

> Whether the patient will be able to work for the next ten years is an interesting dilemma. I think it is going to get rather difficult to do so, particularly if he has to work with a partner who is not as accommodating and protective as his current partner is. I do feel that his occupational longevity will be limited even having some insight into the drive to go to work that this gentleman has. I do not think he will be able to work fulltime full-duty in his current occupation. That, realistically, will be a financial loss as well as a personal one . . . It is a shame this individual has permanent loss of functionality in terms of range of motion, ability to work overhead, absolute strength and just pain as a permanent sequela of the 4/12/18 accident. These problems will get worse with time and treatment, whether it be palliative or curative, will involve inconvenience, cost and risk. His option will be to decrease his work or stop working to decrease his symptomatology or push further to increasingly aggressive treatment.

[Dkt. No. 51-3, Exhibit C]. Beyond the objective medical diagnoses and Dr. Goldstein's narrative report, Dr. Crouse's findings were informed by Telmanoski's reported limitations of daily pain in his left shoulder, pain increasing with exertion, difficulty lifting, difficulty carrying, difficulty reaching, difficulty working overhead, fatigue, limited range of motion, difficulty with household chores, and difficulty sleeping. [Dkt. No. 51-3, Exhibit D]. Dr. Crouse also considered the answers given by Telmanoski in his vocational interview. As Dr. Crouse explained,

> Persons are identified as having a physical disability if they respond "Yes" to the following question: "Does this person have any of the following long-lasting conditions: A condition that substantially limits one or more basic physical activities such as walking, climbing stairs, reaching, lifting, or carrying?" A "non-severe" disability exists if a person responds "No" to both of the following questions: "Because of a physical, mental, or emotional condition lasting 6 months or more, does this person have any difficulty doing any of the following activities: dressing, bathing, or getting around inside the home?" and "Because of a physical, mental, or emotional condition lasting 6 months or more, does this person have any difficulty in doing any of the following activities: going outside the home alone to shop or visit a doctor's office?" Mr. Telmanoski meets the ACS description of a "non-severe" physical disability based upon the vocational interview I conducted and the medical records and narrative reports that I reviewed.

7

Crouse Report of March 24, 2020, p. 3-5 [Dkt. No. 52-1]. Because Dr. Crouse's finding could rationally proceed from the foregoing factual considerations, the Court cannot conclude that it was made by resort to conjecture or unreasonable inference. The Court is satisfied that the records relied upon by Dr. Crouse provide sufficient foundation to permit for his calculation of anticipated loss of lifetime earnings based on the assumption that Telmanoski may obtain work consistent with the limitations characteristic of a "non-severe physical disability" as termed by the ACS. Drawing upon this information as well as his years of relevant experience, Crouse applied the selected vocational scrutiny by relating Telmanoski's conditions and reported limitations to the applicable definition as tracked in the ACS. Dr. Crouse was not expounding from speculation when he found Telmanoski may obtain work consistent with the "non-severe physical disability" category. Rather, he simply harmonized Dr. Goldstein's description of limitations with the terminology employed by the ACS. Because Dr. Crouse derives his findings from facts specific to Telmanoski, the Court finds his analysis to serve as a reasonable measure – or a good "fit" – for his ultimate conclusions.

Bonefish's attempted analogy to *Flynn* is unavailing. In *Flynn*, the court precluded a portion of the plaintiff's medical expert testimony relating to the plaintiff's spine and upper extremity. *Flynn v. Delaware River & Bay Auth.*, No. CV 18-10505 (JS), 2019 WL 5733716, at *6 (D.N.J. Nov. 5, 2019). Specifically, the court found that the medical expert's opinions on prognosis and causation would not be assistive to a jury because the expert did not explain how the accident caused or aggravated plaintiff's injuries to his neck and left upper extremity. *Id.* Contrary to Bonefish's suggestion, Dr. Crouse has not substituted his own judgement to render a medical opinion that

Telmanoski suffers a non-severe disability. Nor is Dr. Crouse's proposed testimony being offered to convey the opinion of the doctors or the contents of the report. Instead, Dr. Crouse is speaking to his own opinion in the area in which he is expert – vocational rehabilitation. The proposed testimony regarding Telmanoski's work-life expectancy is offered for purposes of allowing the factfinder to hear the basis upon which Dr. Crouse came to his opinion in his area of expertise. Though an expert can rely upon matters not in evidence in forming an opinion,[2] the Court does apprehend a distinction between estimating damages from facts in evidence and considering inadmissible evidence insofar as the reason for exclusion might render the opinion dubious and thus unreliable under Federal Rule of Evidence 702. But under these circumstances where Dr. Goldstein's opinion and other evidence relied upon by Dr. Crouse have not been challenged on an evidentiary basis or otherwise definitively contradicted, it would be unbefitting to preclude his proposed testimony at this juncture.

    Bonefish attacks Dr. Crouse's factual assumptions by referencing its own medical expert's opinion that "Plaintiff's prognosis is good" and "there was pre-existing degeneration, Plaintiff has returned to work full duty, and no future treatment is required." If credited by a factfinder, such opinion could conceivably undermine the foundation undergirding Dr. Crouse's analysis. However, it is not the Court's function to weigh this evidence and determine the truth of the matter on the present motion. The Court must not usurp the jury's role of determining the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions

---

[2] *See Matter of James Wilson Associates*, 965 F.2d 160, 172–73 (7th Cir. 1992) (expert is allowed to explain the facts underlying his opinion, even if they would not be independently admissible).

based on that analysis[.]" *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 167 (D.N.J. 2020) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)) (internal quotations omitted). Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded. *Sterling v. Redevelopment Auth. of City of Philadelphia*, 836 F. Supp. 2d 251, 272 (E.D. Pa. 2011), aff'd, 511 F. App'x 225 (3d Cir. 2013).

In sum, what Dr. Crouse has done is conduct an analysis based on an assumption, as experts are allowed, that Dr. Goldstein's findings and other facts exist as evidence of a non-severe disability as defined by the ACS. For the reasons discussed, the Court is satisfied that Telmanoski has established the requisite link between Dr. Crouse's finding in this respect and the underlying medical records and other facts considered. The weight and credibility of the data upon which Dr. Crouse relied are best challenged though traditional tools for testing the validity of expert testimony, such as cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *See Daubert*, 509 U.S. at 596.

Provided the opinion does not purport to serve as medical opinion of disability then, Dr. Crouse will be permitted to calculate what Telmanoski's damages are. Although Dr. Crouse may not diagnose Telmanoski or provide any medical opinions concerning his specific limitations, he may offer general testimony regarding the functional limitations and degree of impairment he has observed during his career for purposes of relating Telmanoski's circumstances to the appropriate ACS category.

### b. Census Definition of Disability

The ACS has altered its survey questions several times over the past two decades to garner information about populations of interest to government researchers. The use of survey questions represents an exercise constructed to assist in estimating economic loss. Bonefish has not established that the replacement of the "physical disability" question with a "mobility disability" renders the data relied upon as invalid. Nor has Bonefish demonstrated that the disability construct used by Dr. Crouse is outdated. Rather, they are simply two different definitions that yield similar results. Accordingly, Dr. Crouse's use of data derived from the "physical disability" question does not make his opinion inadmissible as a matter of law under Federal Rule of Evidence 702. The weight and credibility of the data upon which Dr. Crouse relied are best challenged though traditional tools for testing the validity of expert testimony, such as cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *See Daubert*, 509 U.S. at 596.

### IV. Conclusion

For the reasons set forth herein, the motion filed by defendant Bonefish Grill, LLC seeking to preclude the testimony of Telmanoski's economic and vocational expert, or in the alternative, for an evidentiary hearing pursuant to Federal Rule of Evidence 104 [Dkt. No. 51] will be denied. An appropriate order will follow.

November 29, 2022  /s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez, USDJ